## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-2210 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| KYLE EALEY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Anthony Harris, a pretrial detainee, picked a fight with a guard at the Cook County Jail. Harris was in the bullpen (a holding area), and he didn't want to be there. So he kept pushing the button for assistance. When the guard opened the door, Harris started rolling back his shoulders, as if he was getting ready for physical activity. Defendant Kyle Ealey, the guard, entered the room. That's when Harris started swinging.

He picked a fight with the wrong guard. By the look of things, Harris isn't a particularly large man. But the guard is. Ealey is six feet, eight inches tall. He is more suited to the NFL than Harris is to a boxing ring.

Harris swung his fists – left and right, again and again – in the direction of Ealey, who slowly walked toward him. Harris punched the air, over and over, like a Rocky Balboa wannabe. He gave a good licking to a pretend punching bag hanging right in front of Ealey. He didn't appear to land any blows, and it looks like he stopped his punches just shy of Ealey.

After Harris made eight swings in his direction, Ealey finally grabbed him. Ealey grabbed his shoulders, and then his arms. Harris resisted, but it didn't take Ealey long to subdue

him.  During the melee, Ealey choked Harris for a few seconds, and shoved him against a wall.
But Harris eventually crumpled like a Styrofoam cup.

The whole thing took approximately 20 seconds.  It was more like wrestling than boxing.
Once Harris went down, he stayed there until help arrived.  Ealey did not hit him, and he stopped
the physical activity when Harris stopped resisting.

Harris is the only one who threw any punches.  But Harris eventually sued.  He claims
that Ealey violated his constitutional rights by using excessive force.

After discovery, Ealey moved for summary judgment.  The motion is granted.  After
watching the video, no reasonable jury could find excessive force.  And Ealey is protected by
qualified immunity, too.

## Background

In April 2017, Anthony Harris was a pretrial detainee at the Cook County Department of
Corrections.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 1 (Dckt. No. 111-1).  On April 10,
corrections officer Kyle Ealey escorted Harris to the bullpen, a holding cell for multiple inmates.
*Id.*

The bullpen has security cameras, and the record includes footage of the incident.  *See*
Video (Dckt. No. 112-3).  The footage shows a room with 13 long benches for inmates, with
several feet between each bench.  *Id.*  The room also has a toilet in the corner, and along one wall
is a set of windows and a door.  *Id.*  The camera is in the corner of the room, and it is facing the
door, so it gives a good look at anyone who enters the room.

Corrections officers use the door to bring inmates in and out of the bullpen.  *See, e.g.*, *id.*
at 15:33-38.  And right next to the door is a button that, when pushed, alerts the corrections

2

officers' command center.  *See* Harris Dep., at 7:14-19 (Dckt. No. 99-3); Ealey Dep., at 46:7-13 (Dckt. No. 111-2).

The bullpen wasn't crowded during the incident in question.  There were more benches (13) than inmates (10).  There was plenty of room.  *See* Video (Dckt. No. 112-3).  There was enough space for each inmate to have his own bench, and a few inmates were even lying down on the benches.  *Id.*

But Harris thought it was uninhabitable based on an experience from a few days before. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 111-1).  Harris described it as unsanitary and overcrowded.  *Id.* at ¶ 6.  So, when Harris entered the bullpen, he asked Ealey if anyone had cleaned the bullpen.  *Id.* at ¶ 3.  Ealey assured him that the bullpen was clean, and that Harris would not be there long anyway.  *Id.* at ¶ 4.

But Harris didn't think that he belonged in the bullpen.  *Id.* at ¶ 5.  About half an hour later, frustrated that he was still there, Harris pressed the button to alert the command center.  *Id.* at ¶ 8.  A woman responded and told Harris to talk to Ealey.  *Id.* at ¶ 9.  Harris then told Ealey that he wanted to talk to a sergeant, but Ealey denied that request.  *Id.* at ¶ 10.

Harris persisted.  He pressed the button again and told the woman that Ealey had denied his request.  *Id.* at ¶¶ 12–13.  She told Harris that she would work on it.  *Id.* at ¶ 14.

After another 10 to 15 minutes, Harris pressed the button a third time.  *Id.* at ¶ 15.  Ealey came to the door of the bullpen and told Harris to stop pushing the button.  *Id.* at ¶ 16.  But Harris felt that Ealey's demand was threatening.  *Id.* at ¶ 17.  He was frustrated and pushed the button for a fourth time.  *Id.* at ¶ 18.

The record includes a video of the room, and the footage runs about half an hour.  It covers the 15 minutes before and after the fight, plus the fight itself.  It's not immediately obvious to the Court if the video captured all of the times that Harris pushed the button.  But the footage does show Harris standing at the doorway, with his hand near the button.  And the footage captured the entire fight, too.

Ealey came back to the entrance of the bullpen, accompanied by another inmate.  *Id.* at ¶ 19.  But when Ealey opened the door, things went south.

The video shows Harris moving in front of the door and rolling his shoulders repeatedly, like a boxer warming up before a fight.  *See* Video, at 15:30-33 (Dckt. No. 112-3).  Ealey – towering at six feet, eight inches tall – then walked into the bullpen with another inmate.  *Id.* at 15:32; *see also* Ealey Dep., at 22:20 – 23:1 (Dckt. No. 111-3).  Before Ealey made it through the door, Harris started swinging his arms at Ealey.  *See* Video, at 15:34.

Harris began shadowboxing.  Harris swung at Ealey for a few seconds – about eight swings – moving backward as Ealey moved into the bullpen and walked toward him.  *Id.* at 15:34-36.

In his filings, Harris characterized what happened in rather rosy terms.  As Harris tells it, he was simply setting a boundary by his body movements.  He says that he perceived Ealey to be belligerent and aggressive.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 23 (Dckt. No. 111-1).  According to him, Ealey entered the bullpen with his arms raised and forward in a striking motion.  *Id.* at ¶ 24.  So, Harris argues that he was just trying to keep Ealey out of his personal space.  *Id.* (stating that Harris "placed [his] arms out there several times . . . to stop [Ealey] from entering [his] space . . .").

4

But the video tells a different story. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Court can see – and did see – what happened with its own eyes. The Court does not have to accept a gloss on the evidence if the "videotape tells quite a different story." *Id.* at 378–79 (holding that a videotape showed that there was no genuine issue of material fact, even though the parties characterized the facts differently); *see id.* at 380–81 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) ("When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape."); *Holm v. Village of Coal City*, 345 F. App'x. 187, 190 (7th Cir. 2009) (considering record evidence rather than a party's characterization of the evidence). There is no suggestion that the recordings are unreliable or inauthentic.

In reality, the video shows Harris warming up for a fracas even before the door opened. *See* Video, at 15:30-32 (Dckt. No. 112-3). When Ealey entered the bullpen, Ealey's arms were at his side. *Id.* at 15:34-36. And they remained at his side while Harris swung at least eight times at him. *Id.*

The video doesn't show if any of Harris's swings struck Ealey. And the parties dispute the point. *See* Def.'s Statement of Facts, at ¶ 27 (Dckt. No. 99-2); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 27 (Dckt. No. 111-1).

If Harris didn't strike, he got close to striking. But the blow, if any, wasn't particularly impressive. Ealey didn't flinch. And there was no discernible punch to the head or the face.

After a few seconds of swings (that may or may not have struck Ealey), Ealey grabbed him. Harris may have been boxing, but Ealey did something closer to Greco-Roman wrestling. He grabbed Harris by the shoulders, and then the arms, trying to restrain him. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 29 (Dckt. No. 111-1);[1] *see also* Video, at 15:36-38.

As he grabbed Harris, Ealey lunged forward and pushed Harris against the wall. *See* Video, at 15:36-38 (Dckt. No. 112-3). But Harris resisted. He pushed back and ducked. *Id.* at 15:37-39; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 30 (Dckt. No. 111-1). And Harris says that at that point he felt like he needed to push or fight Ealey. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 31.

After five or six seconds of contact, Ealey grabbed Harris by the neck and choked him for about four seconds. *See* Video, at 15:42-46 (Dckt. No. 112-3). Harris continued to resist, so they wrestled some more, before Ealey banged Harris into the wall. *Id.* at 15:49-50. Harris then slid down the wall. *Id.* at 15:52-53; Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 111-1).

---

[1] Harris denies this fact but fails to cite any evidence in the record in support of his denial. His denial contravenes Local Rule 56.1(e)(3), so this fact and any other disputed facts not supported with evidence are deemed admitted. *See* L.R. 56.1(e)(3).

Ealey radioed for backup once Harris hit the ground and was no longer resisting. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 37–38 (Dckt. No. 111-1). Harris asked for a helping hand to get up, but Ealey waited until reinforcements arrived. Moments later, four other officers arrived, handcuffed Harris, and took him away. *See* Video, at 16:08-41 (Dckt. No. 112-3).

The incident was quick. The physical interaction lasted less than 20 seconds. The whole episode took about 60 seconds. Ealey entered the room, and Harris exited in handcuffs about a minute later.

After the incident, Cook County Jail Sergeant Atkins asked Harris if he had any statements to make. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 39 (Dckt. No. 111-1). Harris said that he did not, and that nothing was wrong. *Id.* at ¶¶ 40–41. Harris now explains that he didn't make a statement because he was afraid that he would be charged with a criminal offense. *Id.* Instead, Harris received a disciplinary infraction for the incident and spent 45 days in segregated housing. *Id.* at ¶¶ 42, 47.

Harris alleges that the incident injured his shoulder and neck. *Id.* at ¶ 43. He received Advil for the pain, but it didn't help. *Id.* at ¶¶ 44–45. Instead, he says that the injuries healed after a few days because of hot showers. *Id.* at ¶ 46.

Harris later brought this lawsuit against Ealey and a few other defendants, including Jane Doe, John Doe, Cook County Sheriff Thomas Dart, Cook County Board President Toni Preckwinkle, and Cook County. He claims that Ealey used excessive force and conspired with others to cover it up. *See* Am. Cplt. (Dckt. No. 33). Harris alleges that Ealey struck him in the face, choked him, and slammed him into the floor. *Id.* at ¶ 4. He seeks a 10-year, 1,000-foot

7

restraining order against the Cook County Sheriff and deputies, along with compensatory damages and punitive damages. *Id.* at ¶ 5.

During prescreening, this Court allowed Harris to proceed on an excessive force claim against Ealey, but dismissed all other claims and defendants. *See* 11/4/19 Order (Dckt. No. 40). After discovery, Ealey moved for summary judgment. *See* Def.'s Mtn. for Summ. J. (Dckt. No. 99).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in

favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Discussion**

Ealey moves for summary judgment on the excessive force claim on two grounds. First, Ealey argues that he used objectively reasonable force. Second, he asserts qualified immunity.

Based on the undisputed facts, Ealey is entitled to summary judgment because he used objectively reasonable force, and because he is protected by qualified immunity. A reasonable jury could come to only one conclusion.

## I.      Excessive Force

All too often, excessive force cases are poor candidates for summary judgment. In many cases, there are issues of fact about what took place, and whether the use of force was appropriate. *See, e.g.*, *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

But not always. The Seventh Circuit has emphasized that "[w]hether a particular use of force was objectively reasonable 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012)); *see also Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013); *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009).

There is no special set of summary judgment rules for excessive force claims. Normal rules apply. So, if countervailing evidence is lacking, it's lacking. Summary judgment is proper when there is no genuine issue of material fact between the parties, or when plaintiff's version of events is accepted as true, and no reasonable jury could find that the use of force was excessive. *See, e.g.*, *Catlin*, 574 F.3d at 367; *Williams*, 809 F.3d at 944.

9

Harris claims that Ealey grabbed him by the neck, choked him, lifted him off of his feet, and shoved him to the wall. He alleges that Ealey used excessive force.

The Due Process Clause of the Fourteenth Amendment governs a claim of excessive force by a pretrial detainee.[2] *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). To succeed, a pretrial detainee must show that the "force purposely or knowingly used against him was objectively unreasonable." *Id.* at 397. A court must make this determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.*

An officer is not required to use the least amount of force possible to restrain an inmate. Rather, the force must be reasonable under the circumstances. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). Officers do not have the luxury of time, and they do not act in an adrenaline-free environment. Officers must make split-second decisions about the use of force in tense, uncertain, and rapidly evolving environments. *See Dockery*, 911 F.3d at 464.

The reasonableness of the conduct depends in part on what an officer is facing at the time. Part of that analysis involves whether someone else was using force – or threatening to use force – against the guard. An officer has more leeway when someone is threatening violence. People can defend themselves, and law enforcement is no exception.

At the summary judgment stage, the question is whether a reasonable jury could find that a use of force was objectively unreasonable. That question depends on factors like (1) the

---

[2] Harris cites the wrong standard. He uses the Fourth Amendment's objective reasonableness test. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 3–4 (Dckt. No. 111). The Fourth Amendment prohibits excessive force during arrests, investigatory stops, and other seizures of free persons. *See Graham v. O'Connor*, 490 U.S. 386, 395 (1985). But the Fourteenth Amendment, not the Fourth Amendment, applies to pretrial detainees' excessive force claims. *Id.* at 395 n.10.

relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *See Kingsley*, 576 U.S. at 397.

The question is what a reasonable officer on the scene would have understood in that moment, without the benefit of hindsight. *Id.* Guards do not have the benefit of sitting back in chambers, leisurely wondering how best to proceed. Especially when fists are flying.

Based on the record as a whole, and after giving Harris the benefit of all reasonable inferences, all of the factors weigh heavily in favor of the reasonableness of the use of force. In fact, the balancing is so lopsided that no reasonable jury could find in Harris's favor.

Factor one involves the relationship between the need for the use of force and the amount of force actually used. *Id.* Here, the force was not disproportionate to the need for force.

From the moment that he stepped into the room, Ealey faced an inmate who was threatening him with blows. He was greeted by swings from Harris. Ealey, meanwhile, was all by himself. He confronted an inmate who was throwing punches, and he had no one else to turn to. He had to take matters into his own hands.

Harris threatened the guard by swinging his fists, and that threat created a need for force. Flying fists can cause serious injury. Ealey had the right to defend himself. He didn't have to stand there as Harris swung at him. He is a guard, not a punching bag.

If anything, Ealey showed patience and restraint. He didn't grab Harris until Harris swung in his direction, eight times. Ealey didn't have to wait until Harris landed a blow or decided to stop swinging.

11

Ealey used gradual force, too. He didn't respond by striking Harris. And he didn't choke him right away. Ealey grabbed his arms and shoulders, trying to get him under control. Meanwhile, Harris continued to resist. Ealey's level of force matched the level of the threat, and the level of the resistance.

Harris posed more than a physical danger. He created a broader security risk, too. Ealey was outnumbered – there were 10 other inmates in the room – and it was important to maintain order. Ealey had no way of knowing if other inmates were going to enter the fray and gang up on him. So he put a stop to the first person who threatened him.

Prisons are dangerous places, and maintaining order is one of the keys to security. A prison guard can use force in good faith to restore order. *See Rice v. Corr. Med. Servs.*, 675 F.3d 650, 667 (7th Cir. 2012) (discussing excessive force in the Eighth Amendment context). When a guard restores order through force, the inquiry is "whether the force was applied in a good faith effort to maintain or restore discipline or sadistically for the very purpose of causing harm." *Id.* at 668.

On this record, no reasonable jury could find that Ealey used force sadistically or for the purpose of causing harm to Harris. All things considered, Ealey used minimal force. If anything, it's hard to imagine what else Ealey could have done. Grabbing someone who is throwing punches seems like the least forceful way of getting that person under control.

Harris draws attention to Ealey's large size and argues that Ealey should have de-escalated the situation. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 4 (Dckt. No. 111). Harris insists that he never posed an equivalent threat of choking or slamming Ealey to the ground. *Id.*

But Harris posed a threat, even though he was smaller. To keep with the boxing analogy, there are plenty of undersized fighters who can deliver debilitating blows. *See, e.g.*, Oscar de la Hoya (5' 10", 145 lbs.), Manny Pacquiao (5' 5", 146 lbs.), Floyd Mayweather (5' 8", 150 lbs.); *see also* Conor McGregor (5' 9", 170 lbs.). A smaller person can deliver a big punch.

The type of force used by Ealey was reasonable, too. He grabbed, pushed, pulled, and choked. But he didn't punch. And the length of the force was reasonable, too. Even the choking – the strongest use of force – lasted only a few seconds, until Harris calmed down.[3]

Factor two – the extent of Harris's injuries – also weighs in favor of Ealey. Harris grappled with Ealey, but he wasn't worse for the wear. He had unspecified injuries to his shoulder and neck. That's about it. No cuts, bruises, or abrasions. Not even a scratch.

The injuries are *de minimis*. The injuries are consistent with an attempt to restrain him. Harris says that Advil did not help, and that within a few days, a couple hot showers healed his injuries. A hot shower is refreshing, but it is not medical treatment. If the healing powers of a shower healed him, there wasn't much to heal.

---

[3] Sometimes choking can give rise to an excessive force claim. *See, e.g., Coley v. Lucas County*, 799 F.3d 530, 541 (6th Cir. 2015) ("Chokeholds are objectively unreasonable where an individual is *already restrained* or there is no danger to others.") (emphasis added); *Est. of Booker v. Gomez*, 745 F.3d 405, 425 (10th Cir. 2014) (denying defendant's motion for summary judgment on plaintiff's excessive force claim because "[defendant] used the carotid restraint for approximately two and a half minutes" and "continued to use the restraint while [plaintiff] was handcuffed in a prone, face-down position on the ground"); *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993) (affirming district court's finding that "[defendant's] use of the choke hold and other force used to subdue a non-resisting [plaintiff] and render him temporarily unconscious was unreasonable and was an excessive use of force"); *Choate v. Arms*, 274 F. Supp. 3d 782, 784–86 (M.D. Tenn. 2017) (denying summary judgment because plaintiff was choked "for a period of time to an almost unconscious state," and slammed into a wall while handcuffed "and not resisting in anyway"). But those cases involved more extreme facts than the case at hand. Plaintiff has cited no case law for the notion that choking someone for less than five seconds – while the person is actively resisting – can give rise to an excessive force claim. And this Court has located none.

Minor injuries support the conclusion that the use of force was *de minimis*, and not intended to cause pain or injury to the inmate. *See Outlaw v. Newkirk*, 259 F.3d 833, 840 (7th Cir. 2001) (finding that swelling and bruising to the hand was a minor injury in the Eighth Amendment context); *DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000) (finding that bruising after a shove was a minor injury), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 407 (7th Cir. 2020); *McCottrell v. White*, 933 F.3d 651, 664 (7th Cir. 2019) ("The extent of injury is relevant to the . . . inquiry because it provides some indication of the amount of force applied, and because it may suggest whether the use of force was plausibly necessary in a particular situation.").

Factor three looks to the officer's effort to temper (or limit) the amount of force. Here, Ealey showed restraint when restraining Harris. When Harris finally fell to the ground and relented, Ealey relented too. The force stopped when the resistance stopped.

Factors four and five are intertwined, assessing both the severity of the threat and the threat reasonably perceived by the officer. The threat here was somewhat serious. Ealey was the only officer around. Harris had more than 10 other inmates in the room with him. And Harris started swinging at him the moment he opened the door. Other inmates could have joined Harris.

Maybe Harris didn't strike Ealey. And maybe he wasn't the most dangerous inmate. But the situation was volatile. Ealey – alone, with his blood pumping – faced an inmate who was swinging at him, with 10 nearby inmates who could join at any time. It was reasonable for Ealey to interpret Harris's swings as aggressive and, if not subdued, capable of causing further harm.

All the while, the door to the bullpen remained open. The door was open while Harris swung with closed fists. Inmates could have left the bullpen while Ealey was distracted with

14

Harris. So Ealey faced two potential threats: a threat of violence from Harris, and a threat that other inmates might join in or might walk out the door.

The sixth factor favors Ealey, too, because Harris was actively resisting. Harris cannot and does not deny that he resisted.

Based on the undisputed facts, no reasonable jury could find that Ealey used excessive force. By any measure, a reasonable officer would have perceived Harris as a threat. Ealey used reasonable force to subdue him. And he stopped using force when Harris stopped resisting. Nothing about this incident – the reason for the force, the type of the force, the length of the force, or the extent of the injuries – could support a finding of unreasonable force by a reasonable jury.

## II. Qualified Immunity

Ealey's use of force was not objectively unreasonable. But even if, for the sake of argument, a jury could make that finding, it would not change the outcome. Ealey is entitled to qualified immunity.

The doctrine of qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). As applied to an excessive force claim, "the qualified-immunity doctrine gives enhanced deference to officers' on-scene judgments about the level of necessary force." *Dockery*, 911 F.3d at 466 (quotation marks omitted). "This is so because, even if the plaintiffs demonstrate that excessive force was used, they must further establish that it was objectively unreasonable for the officer to believe that the force was lawful –

15

*i.e.*, they must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013).

"Qualified immunity is an affirmative defense, and once raised, the plaintiff bears the burden of defeating it by showing: (1) the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation." *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018) (citing *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)). "A failure to show either is fatal for the plaintiff's case." *Id.* (quoting *Archer*, 870 F.3d at 613).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Instead, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Dockery*, 911 F.3d at 466 ("[T]he precedent must be 'particularized to the facts of the case.'") (citation omitted). This principle is "particularly important in excessive force cases" because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam).

Here, Harris failed to meet his burden to defeat a qualified immunity defense. Harris says that "it was clearly established that an officer may not use excessive force against an individual by grabbing them by the neck because Defendant indicated he had no training to do such a tactic." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 5 (Dckt. No. 111).

16

That argument does not advance the ball. Harris failed to come forward with any case law supporting a categorical "no choking" rule. He also failed to offer case law saying that a guard cannot use a technique unless and until the guard receives training for that technique.

There is Seventh Circuit authority prohibiting significant and gratuitous force against subdued suspects in certain circumstances. *See, e.g.*, *Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015) (concluding that a reasonable officer was on notice that a manacled, non-resisting suspect already lying on his back did not justify the use of taser); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (finding that a reasonable jury could have determined that the officer deliberately broke the arrestee's jaw with his knee when the arrestee no longer posed a threat, and was already lying "spread eagle" on the ground); *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) ("The Constitution clearly does not allow police officers to force a handcuffed, passive suspect into a squad car by breaking his ribs.").

Harris cites these authorities, arguing that "[i]t has also been clearly established that using a significant level of force on a *passively resisting* individual constitutes excessive force." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 5 (Dckt. No. 111) (emphasis added).

But those cases are distinguishable. Harris was not passively resisting. He was not handcuffed. He was not restrained. He was an active participant in a wrestling match. And he lost.

Ealey's use of force was not significant or gratuitous. As already discussed, Ealey's use of force matched the need. Harris suffered no injuries that suggest otherwise. He recovered within a few days, thanks to hot showers. Significant or gratuitous force would have led to more serious injuries – at the very least, an injury that required more than a hot shower to heal.

17

In sum, based on the undisputed facts, Ealey enjoyed qualified immunity, even if (for the sake of argument) he exercised unreasonable force. *See Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) ("Only when precedent places the invalidity of a particular action beyond debate may damages be awarded."). Ealey restrained Harris without violating any clearly established right, so Harris has no claim.

**Conclusion**

Defendant Ealey's motion for summary judgment is granted.

Date: December 8, 2021 _____

Steven C. Seeger
United States District Judge